ZIMMERMAN REED, PLLP
CHARLES S. ZIMMERMAN, ESQ (AZ Bar No. 029602)
   E-mail: Charles.Zimmerman@zimmreed.com
HART L. ROBINOVITCH, ESQ (AZ Bar No. 020910)
   E-mail:Hart.Robinovitch@zimmreed.com
BRADLEY C. BUHROW, ESQ (CA Bar No. 283791)
(Admission *Pro Hac Vice* to be Filed)
   E-mail: Brad.Buhrow@zimmreed.com
14646 N. Kierland Blvd., Suite 145
Scottsdale, AZ 85254
(480) 348-6400 Telephone
(480) 348-6415 Facsimile

*Attorneys for the Plaintiffs*

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| KYLE PHILLIP, EVELYN TORRES, and KELLY KIRKPATRICK, individually, and on behalf of themselves and all others similarly situated, | Case No.: |
| Plaintiffs, | |
| v. | **CLASS ACTION COMPLAINT** |
| GENERAL MOTORS, LLC, | (Jury Trial Demanded) |
| Defendant. | |

Plaintiffs Kyle Phillip, Evelyn Torres and Kelly Kirkpatrick (collectively referred to hereinafter as "Plaintiffs") bring this action, by and through their undersigned counsel, against Defendant General Motors, LLC (hereinafter referred to as "Defendant" or "GM") on behalf of themselves and all others similarly situated in the Class, based on information and belief and the investigation of counsel, except for information based on personal knowledge, hereby alleges as follows:

## I.  NATURE OF ACTION

1.  This class action lawsuit is brought by the above-named Plaintiffs on behalf of themselves and all other similarly situated persons in the Class and State Subclasses defined below against GM. The case stems from GM's failure to disclose material defects in certain GM vehicles; instead opting to affirmatively conceal the known material defects.

2.     Through this class action Plaintiffs, on behalf of the Class, challenge the unlawful, unfair, and fraudulent business practices of Defendant in connection with its designing, manufacturing, assembling, promoting, marketing, supplying, selling, and otherwise placing into the stream of commerce millions of vehicles throughout the United States and worldwide that have a safety defect in which the vehicles ignition switch can unintentionally move from the "run" position to the "accessory" or "off" position, resulting in loss of power, vehicle speed control, and braking, as well as a failure of the vehicles' airbags to deploy.

3.     Plaintiffs brings this action on behalf of a Class of all persons in the United States who currently own or lease one or more of the following GM vehicles: 2003-2011 Saturn Ion; 2005-2011 Chevrolet Cobalt; 2005-2011 Pontiac G5; 2006-2011 Chevrolet HHR; 2005-2011 Pontiac Pursuit; 2006-2011 Pontiac Solstice; and 2007-2011 Saturn Sky (hereinafter "Defective Vehicles").   These people are referred to herein as the "Class."

4.     Since at least 2002, GM has designed, manufactured, assembled, sold and otherwise placed into the stream of commerce vehicles with common defects related to the ignition switch, all of which create a substantial risk of injury or death when used as designed and for their intended purpose. Each of the Defective Vehicles contains a uniformly designed ignition switch, which is substantially similar for all of the Defective Vehicles.

5.     GM began installing these defective ignition switch systems in models from 2002 through at least 2007 and possibly later. Despite promising that these new ignition switch systems would operate safely and reliably, the defective ignition switch systems suffered from common quality and safety defects, which GM concealed and failed to fix for years.

6.     As early as 2004, GM began receiving reports of crashes and injuries related to the ignition switch systems, which put GM on notice of the serious safety issues presented by its ignition switch system.

7.     Yet, despite GM's knowledge and despite the dangerous nature of the defects and their effects on critical safety systems, GM concealed the existence of the defects and failed to repair the problem.

8.     Rather than eliminate the defects contained in its ignition switch systems – or provide an adequate warning of the potential safety risks to drivers of its Defective Vehicles – GM instead sought to conceal the dangers inherent in their Defective Vehicles.

9.     During all relevant times, GM continued to advertise its Defective Vehicles as being "safe" and "reliable" despite having knowledge that the Defective Vehicles were not safe and reliable.

10.    This case arises from GM's breach of its obligations and duties, including GM's failure to disclose that, as a result of defective ignition switch design, at least 1.4 million GM vehicles had the propensity to shut down during normal driving conditions, which creates an extreme and unreasonable risk of accident, serious bodily harm, and death

11.    GM's predecessor, General Motors Corporation ("Old GM") also violated these duties by designing and marketing vehicles with defective ignition switches, failing to disclose that defect after it became aware that the ignition switch defect was causing fatal accidents. In addition to the liability arising out of the statutory obligations assumed by GM, GM also has successor liability for the deceptive and unfair acts and omissions of Old GM because GM has continued the business enterprise of Old GM with full knowledge of the ignition switch defects.

12.    The defective ignition switches were manufactured by Delphi Automotive PLC ("Delphi"). Once a subsidiary of Old GM, Delphi spun-off from Old GM in 1999, and was an independent publicly held corporation.

13.    Upon information and belief, Delphi knew its ignition switches were defective, but nevertheless continued to manufacture and sell the defective ignition switch systems, which it knew would be used in the vehicles of Plaintiffs and the Class.

14.    Plaintiffs bring this action for a Class of all persons in the United States who currently own or lease one or more of the following GM vehicles: 2003-07 Saturn Ion;

2005-07 Chevrolet Cobalt; 2005-2007 Pontiac G5; 2006-07 Chevrolet HHR; 2005-006 Pontiac Pursuit; 2006-07 Pontiac Solstice; and 2007 Saturn Sky (hereinafter "Defective Vehicles").

15.     Plaintiffs also bring this action on behalf of subclasses of Arizona, New York and Michigan residents who own or lease one or more of the Defective Vehicles.

16.     Plaintiffs believe that there are other GM vehicles which suffer from the same or substantially similar ignition switch defects as the Defective Vehicles identified above. Accordingly, Plaintiffs will supplement the list of Defective Vehicles to include additional GM vehicles that have defective ignition switches, which result in a loss of vehicle speed control, loss of braking control, and airbag non-deployment.

17.     The Defective Vehicles are defective and dangerous for multiple reasons, including the following (collectively referred to herein as the "ignition switch defects"):

        a.     The ignition switches can inadvertently shut off the engine and vehicle electrical system during normal driving conditions;

        b.     When the engine and the electrical system shut down, the power steering and power brakes also shut down, creating a serious risk of accident;

        c.     When the electrical system shuts down, the vehicle's airbags are disabled, creating a serious risk of serious bodily harm or death if an accident occurs.

18.     The ignition switch defects make the Defective Vehicles unreasonably dangerous. The defective nature of the Defective Vehicles renders them likely to be involved in accidents, and, if accidents occur, there is an unreasonable and extreme risk of serious bodily harm or death to the vehicle's occupants.

19.     GM admits to at least twelve deaths as a result of the ignition switch defects, but the actual number is believed to be much higher.

20.     The ignition switch defects present a significant and unreasonable safety risk exposing Defective Vehicle owners and their passengers to a risk of serious injury or death.

The safety risks presented are ongoing and continuing.

21.     For many years, GM has known of the ignition switch defects that exist in millions of Defective Vehicles sold in the United States. But, to protect its profits and maximize sales, GM concealed the defects and their tragic consequences and allowed unsuspecting vehicle owners to continue driving highly dangerous vehicles.

22.     Under the Transportation Recall Enhancement, Accountability and Documentation Act ("TREAD Act"),[1] and its accompanying regulations, when a manufacturer learns that a vehicle contains a safety defect, the manufacturer must promptly disclose the defects.[2] If it is determined that the vehicle is defective, the manufacturer had an affirmative duty to notify and warn vehicle owners, purchasers, and dealers of the defect and must remedy the defect.[3]

23.     This duty is continuing and arouse when GM, including General Motors Corporation, learned of the ignition switch defect. As such, this duty to disclose continued through all times relevant to this Complaint. The duty to disclose survived and continued through General Motors Corporation's bankruptcy, and was assumed by GM the moment GM was formed. GM had a continuing duty to notify and warn vehicle owners, purchasers, lessees, and dealers of the defect and to take steps to remedy the defect in each Class member's vehicle each and every day since it was formed. As described within, GM failed to do this and breached its duties.

24.     In addition to the TREAD Act and other laws, GM violated, *inter alia*, the Arizona Consumer Fraud Act, the Michigan Consumer Protection Act and New York's Consumer Protection from Deceptive Acts and Practices Statute and fraudulently concealed the deadly ignition switch defects from consumers, owners, and lessees of the Defective Vehicles. GM also violated the TREAD Act by failing to timely inform NHTSA of the ignition switch defects and allowed cars to remain on the road with these defects.

25.     GM's actions, beaches of its duties, and concealment of material facts injure

---

[1]  49 U.S.C. §§ 30101-30170.
[2]  49 U.S.C. § 30118(c)(1) & (2)
[3]  49 U.S.C. § 30118(b)(2)(A) & (B).

and harm consumers in the Class by inducing them to unknowingly purchase and/or retain a vehicle that contains inherent dangers and defects. Given GM's superior knowledge of the ignition switch defects and the inherent risk of the danger involved in their continued use, GM had an ongoing duty to disclose such facts to members of the class. During relevant time periods, GM's provided no notice of the inherent and potential risks of use of their Defective Vehicles to consumers, but rather concealed those risks through omissions of material fact and through affirmative representations in marketing, sales and operational material that represent that the Defective Vehicles are safe and defect-free.

26.    Reasonable consumers in the Class would have acted differently had they been told of the material facts regarding the defects and safety risks presented.   GM concealed and suppressed material facts when they were duty bound to disclose such facts. At the very least, had Old GM or GM disclosed the ignition switch defects and safety risks presented sooner, as they were duty bound to do, Plaintiffs and members of the Class, like any reasonable consumers, would not have purchased the vehicles they did; would have paid less than they did; would not have retained the vehicles; and/or would have demanded that GM correct the ignition switch defect sooner.   GM's fraudulent concealment and deceptive practices prevented this.   As a result, any statutes of limitations should be tolled.

27.    Plaintiffs and the Class have been further damaged by GM's misrepresentations, concealment and non-disclosure of the ignition switch defects in the Defective Vehicles, as they are now holding highly dangerous vehicles whose value has greatly diminished because of GM's failure to timely disclose the serious defect.

28.    Plaintiffs and the Class were also damaged by the acts and omissions of Old GM for which GM is liable through successor liability because the Defective Vehicles they purchased are worth less than they would have been without the ignition switch defects.

29.    Plaintiffs and the Class paid more for the Defective Vehicles than they would have had they known of the ignition defects or they would not have purchased the Defective Vehicles at all.

## II.     JURISDICTION AND VENUE

30.     This Court has diversity jurisdiction over this action under 28 U.S.C. §1332(a) and (d) because the amount in controversy for the Class exceeds $5,000,000.00, and Plaintiffs and other Class members are citizens of a different state than Defendant.

31.     This Court has personal jurisdiction over Plaintiffs because Plaintiffs submits to the Court's jurisdiction. This Court has personal jurisdiction over GM because GM conducts substantial business in this District, and some of the actions giving rise to the complaint took place in this District.

32.     Venue is proper in this District under 28 U.S.C. §1391 because a substantial part of the event or omissions giving rise to the claims occurred within this District, and because Plaintiff Kyle Phillip is a resident of Flagstaff, Arizona, which is in this District. Additionally, GM transacts business within the District, and some of the events establishing the claims arose in this District.

## III.     PARTIES

33.     Plaintiff and Named Class Representative Kyle Phillip is a resident and citizen of Flagstaff, Arizona. Plaintiff owns a 2006 Saturn Ion.  Plaintiff chose the Ion in part because he wanted a safely designed and manufactured vehicle.

34.     Induced by GM's fraudulent concealment and misrepresentations about the existence of a defect of the severity and extent of defects, which left his without knowledge of the conditions or the lack of value in a vehicle containing such unremedied defects, Plaintiff purchased his Saturn Ion in 2012 from Dodge, Jeep and Chrysler in Flagstaff, Arizona. He paid between around $5,300 for the Ion, not knowing that it was sold in the defective condition.

35.     Plaintiff Phillip experienced problems with the ignition system in his Ion. Since owning the Ion it has shut down approximately five (5) times. As such, Plaintiff Phillip is concerned about the safety of his Ion. GM should have disclosed the ignition switch defect when Plaintiff Phillip purchased his Ion.

36.     In addition to the Saturn Ion, Plaintiff Phillip owns a 2009 Chevrolet HHR.

37.     Induced by GM's fraudulent concealment and misrepresentations about the existence of a defect of the severity and extent of defects, which left his without knowledge of the conditions or the lack of value in a vehicle containing such unremedied defects, Plaintiff purchased his HHR in 2013 from Terry Marxen Chevrolet and Cadillac in Flagstaff, Arizona. He paid between around $22,000 for the HHR, not knowing that it was sold in the defective condition.

38.     Plaintiff Phillip did not learn of the ignition switch defects until about March 2014. Had Old GM or GM disclosed the ignition switch defects, Plaintiff Phillip, like any reasonable consumer, would not have purchased the vehicles he did; would have paid less than he did; would not have retained the vehicles; and/or would have demanded that GM correct the ignition switch defects sooner. GM's fraudulent concealment and deceptive practices prevented this.

39.     Plaintiff and Named Class Representative Evelyn Torres is a resident and citizen of New York, New York. Plaintiff owns a 2007 Chevrolet Cobalt.  Plaintiff chose the Cobalt in part because she wanted a safely designed and manufactured vehicle.

40.     Induced by GM's fraudulent concealment and misrepresentations about the existence of a defect of the severity and extent of defects, which left her without knowledge of the conditions or the lack of value in a vehicle containing such unremedied defects, Plaintiff retained possession of her Cobalt.

41.     Plaintiff Torres did not learn of the ignition switch defects until about March 2014.  Had Old GM or GM disclosed the ignition switch defects, Plaintiff Torres, like any reasonable consumer, would not have purchased the Cobalt; would have paid less than she did; would not have retained the vehicle; and/or would have demanded that GM correct the ignition switch defect sooner.  Defendant's fraudulent concealment and deceptive practices prevented this.

42.     Plaintiff and Named Class Representative Kelly Kirkpatrick is a resident and citizen of Mancelona, Michigan. Plaintiff owns a 2007 Saturn Ion.  Plaintiff chose the Ion in part because she wanted a safely designed and manufactured vehicle.

43.     Induced by GM's fraudulent concealment and misrepresentations about the existence of a defect of the severity and extent of defects, which left her without knowledge of the conditions or the lack of value in a vehicle containing such unremedied defects, Plaintiff Kirkpatrick purchased her Saturn Ion in 2009 from Bill Marsh Auto in Michigan. She paid between $12,000 and $13,000 for the Ion, not knowing that it was sold in the defective condition.

44.     Plaintiff Kirkpatrick did not learn of the ignition switch defects until about March 2104. Had Old GM or GM disclosed the ignition switch defects, Plaintiff Kirkpatrick, like any reasonable consumer, would not have purchased the Cobalt; would have paid less than she did; would not have retained the vehicle; and/or would have demanded that GM correct the ignition switch defect sooner.  GM's fraudulent concealment and deceptive practices prevented this.

45.     Defendant General Motors LLC ("GM") is a foreign limited liability company formed under the laws of Delaware with its principal place of business located at 300 Renaissance Center, Detroit, Michigan.

46.     GM, which is the successor GM entity resulting from the GM Chapter 11 bankruptcy proceeding, contractually assumed liability for the claims in this lawsuit. The Defective Vehicles were originally designed, manufactured, marketed, and distributed into the stream of commerce by GM's predecessor, General Motors Corporation ("Old GM."). GM incorporated in 2009 and on July 10, 2009 acquired substantially all assets and assumed certain liabilities of Old GM through the Chapter 11 bankruptcy proceeding.

47.     As demonstrated by the fact that GM has initiated and is conducting a recall of the Defective Vehicles (although being incomplete), it is legally responsible for those vehicles still on the road and recognizes that it is responsible for those vehicles despite old GM's bankruptcy.

48.     Among the liabilities and obligations expressly retained by GM after the bankruptcy are the following:

From and after the Closing, Purchaser [GM] shall comply with the certification, reporting and recall requirements of the National Traffic and Motor Vehicle Act, the Transportation Recall Enhancement, Accountability and Documentation Act, the Clean Air Act, the California Health and Safety Code, and similar laws, in each case, to the extent applicable in respect of vehicles and vehicle parts manufactured or distributed by [Old GM].

49.    GM also expressly assumed:

all Liabilities arising under express written warranties of [Old GM] that are specifically identified as warranties and delivered in connection with the sale of new, certified used or pre-owned vehicles or new or remanufactured motor vehicle parts and equipment (including service parts, accessories, engines and transmissions) manufactured or sold by [Old GM] or Purchaser prior to or after the Closing and (B) all obligations under Lemon Laws.

50.    Because GM acquired and operated Old GM[4] and ran it as a continuing business enterprise, and because GM was aware from its inception of the ignition switch defects in the Defective Vehicles, GM is liable through successor liability for the deceptive and unfair acts and omissions of Old GM, as alleged in this Complaint.

51.    Additionally, in current advertisements and promotional material, including but not limited to GM's website,[5] GM represents and holds itself out to the public as being the same company as Old GM.

52.    Specifically, GM represents on its website that GM "has played a pivotal role in the global auto industry for more than 100 years. From the first Buick horseless carriages to technological marvels like the Chevrolet Volt, our products and innovations have always excelled at putting the world on wheels."

53.    GM cannot absolve itself of liability due to any bankruptcy proceedings involving Old GM, prior to the formation of GM. Material facts regarding the defects and

---

[4]    Through the sale of Old GM to GM, specifically through the Amended and Restated Master Sale and Purchase Agreement, GM purchased and is the owner of all "vehicles" and "finished goods" (cars) of old GM, "wherever located," and including any vehicles or finished goods in the "possession of" "customers." Further, GM is the owner of all Old GM's documents and has knowledge thereof. Under this agreement, GM both "Purchased Assets" and "Assumed Liabilities," which included "all Liabilities arising out of, relating to, in respect of, or in connection with the use, ownership or sale of the Purchased Assets" after the sale.

[5]    http://www.gm.com/company/historyAndHeritage.html (last visited March 27, 2014).

potential liabilities were never disclosed in those proceedings but intentionally and deceptively concealed and suppressed from the public, the courts and the Class.

## IV.   FACTUAL ALLEGATIONS

**A.    The Defective Vehicles Share A Common Defect ("Ignition Switch Defect"), Which GM Had Knowledge Of For At Least a Decade; Actively Concealing Such Knowledge And Defects The Entire Time.**

54.    Beginning at least in 2002, and continuing until at least 2007, GM designed, manufactured, assembled, marketed, sold and otherwise placed into the stream of commerce vehicles containing defective ignition switch systems – the Defective Vehicles.

55.    The defective ignition switch systems in the Defective Vehicles cause the car's engine and electrical system to shut off, disabling the power steering, power brakes, and disabling numerous safety related features, including but not limited to, the non-deployment of the vehicle's airbags in the event of a crash.

56.    Given the importance that a vehicle and its electrical operating systems remain operational during ordinary driving conditions, it is imperative that a vehicle manufacturer ensure that its vehicles remain operational from the time the driver starts the vehicle until the driver intentionally shuts down the vehicle. With respect to the Defective Vehicles, GM has failed to do so.

57.    The Defective Vehicles, therefore, create serious safety risks, as they are unreasonably prone to be involved in accidents, and those accidents are unreasonably likely to result in serious bodily injury or death to the drivers and passengers of the Defective Vehicles, as well as to other vehicle operators and pedestrians.

58.    Under the Transportation Recall Enhancement, Accountability and Documentation Act ("TREAD Act"),[6] and accompanying regulations, GM and Old GM both had a duty to promptly disclose the ignition switch defect to Class members when GM and/or Old GM learned of the safety related defect and to fully repair the defect. This duty to disclose arouse upon learning of the defect and continued each and every day up until the date of this filing.

---

[6]    49 U.S.C. §§ 30101-30170.

59.     Alarmingly, however, both Old GM and GM had actual knowledge of the deadly ignition switch defects and their dangerous consequences for many years. Notwithstanding this knowledge, Old GM and GM failed to disclose the defect for many years; concealing the true nature and extent of the defect. During relevant time periods, GM and Old GM never attempted to eliminate the ignition switch defect, nor minimize the effect of the ignition switch defects. Old GM and GM never stopped selling and placing the dangerous Defective Vehicles into the stream of commerce. Old GM and GM never provided adequate warnings of the risks of use of the Defective Vehicles. Rather, both Old GM and GM actively concealed the dangers and risks inherent in their Defective Vehicles from consumers, and federal regulators such as NHTSA.

60.     For example, on July 29, 2005, Amber Marie Rose, age 16, died after her 2005 Chevrolet Cobalt crashed and the airbag failed to deploy. Ms. Rose's death was the first of the hundreds deaths and injuries attributable to the ignition switch defects. Ms. Rose's death was an early warning in what would become a decade-long failure by Old GM and GM to address the ignition switch problem.

61.     Another incident involved sixteen year-old Megan Phillips. Ms. Phillips was driving a 2005 Chevrolet Cobalt that crashed in Wisconsin in 2006, killing two of her teenage friends when the car left the road and hit a clump of trees. NHTSA investigators found that the key had moved from the "run" to the "accessory" position, turning off the engine and disabling the vehicle's airbags before impact. According to Ms. Phillips, the families of her deceased friends blamed her and refused to speak with her; only after the recall was finally announced did they began communicating. As she stated, "I don't understand why [GM] would wait 10 years to say something. And I want to understand it but I never will."[7]

62.     Rather than publicly admitting the dangerous safety defects in its vehicles, GM attempted to attribute these and other incidents to "driver error." Every year from 2005 to 2012, first Old GM and then GM received reports of deaths in Cobalts involving steering

_____
[7]   "*Owners of Recalled GM Cars Feel Angry, Vindicated*," Reuters (Mar. 17, 2014).

and/or airbag failures, including:

- 2005: 26 Cobalt Death and Injury Incidents, including 1 death citing Airbag as component involved.

- 2006: 69 Cobalt Death and Injury Incidents, including 2 deaths citing Airbag as component involved and 4 deaths citing Unknown component.

- 2007: 87 Cobalt Death and Injury Incidents, including 3 deaths citing Airbag as component involved.

- 2008: 106 Cobalt Death and Injury Incidents, including 1 death citing Airbag as component involved and 2 deaths citing Unknown component.

- 2009: 133 Cobalt Death and Injury Incidents, including 1 death citing Airbag as component involved, 1 death citing Service Brake as component involved, 1 death citing Steering as component involved, and 2 deaths citing Unknown component.

- 2010: 400 Cobalt Death and Injury Incidents, including 2 deaths citing Airbag as component involved, 12 deaths citing steering as component involved, and 1 death citing Unknown component.

- 2011: 187 Cobalt Death and Injury Incidents, including 2 deaths citing Airbag as component involved, 2 deaths citing Steering as component involved, and 1 Unknown component.

- 2012: 157 Cobalt Death and Injury Incidents, including 5 deaths citing Airbag as component involved, and 4 deaths citing Steering as component involved.

63.     GM now admits that Old GM learned of the ignition switch defects as early as 2001. During developmental testing of the Saturn Ion, Old GM engineers learned that the ignition could inadvertently move from the "Run" position to the "Accessory" or "Off" position.[8]

64.     Specifically, a pre-production report for the model year 2003 Saturn Ion identified issues with the ignition switch, noting that the two causes of failure were "[l]ow contact force and low detent plunger force."

65.     Instead of fixing the defect, GM began manufacturing and selling the Saturn Ion with the ignition system defect in 2002.

---

[8] *"G.M. Reveals It Was Told of Ignition Defect in '01,"* D. Ivory, NEW YORK TIMES (Mar. 12, 2014).

13

66.     In 2003, an internal report documented an instance in which the service technician observed a stall while driving. The service technician noted that the weight of several keys on the key ring had worn out the ignition switch. It was replaced and the matter was closed.[9]

67.     According to GM's latest chronology submitted to NHTSA pursuant to 49 CFR §573.6, Old GM engineers encountered the problem again in 2004 during test drives of the Chevy Cobalt, before it went to market.

68.     Old GM opened an engineering inquiry, known as a "Problem Resolution Tracking System inquiry" ("PRTS"), to investigate the issue. According to the chronology provided to NHTSA by GM, engineers pinpointed the problem and were "able to replicate this phenomenon during test drives."

69.     The Old GM engineers "believed that low key cylinder torque effort was an issue and considered a number of potential solutions." However, after considering cost and the amount of time it would take to develop a fix, Old GM did nothing.

70.     In 2004, an Old GM engineer observed a Chevrolet Cobalt during testing lose all power when the engineer inadvertently bumped the key in the ignition.[10]

71.     Notwithstanding the knowledge of the defect, Old GM placed the Chevrolet Cobalt into the market in 2005. However, Old GM immediately started getting complaints about sudden loss of power incidents, "including instances in which the key moved out of the 'run' position when a driver inadvertently contacted the key or steering column."[11] In response, Old GM opened additional PRTS inquires.

72.     In February 2005, as part of the PRTS, Old GM engineers began looking into ways to solve the problem of the key moving from the "run" to the "accessory/off" position during ordinary driving.

73.     As part of the February 2005 PRTS, Old GM engineers opined that the only

---

[9]   *Id.*
[10]  http://money.cnn.com/infographic/pf/autos/gm-recall-timeline/?iid=EL
[11]  March 11, 2014 Chronology Re: Recall of 2006 Chevron HHR and Pontiac Solstice, 2003-2007 Saturn Ion, and 2007 Saturn Sky Vehicles, at 1.

"sure solution" to fixing the problem of the key inadvertently moving from the "run" to the "accessory/off" position required changing from a low mount to a high lock module, which, according to Old GM engineers would considerably reduce the possibility of the key being impacted by the driver.

74.     According to Old GM engineers, this change in the key position on the lock module, combined with increasing the detent in the ignition switch, [12] would be a "sure solution."

75.     However, Old GM rejected this approach, in part, because the cost to implement the solution would be too high.

76.     Rather than satisfy its ongoing duty to provide notice of the known safety defect, in February 2005, Old GM issued a Technical Service Bulletin ("TSB") to its dealers regarding the engine stalling incidents in 2005 Cobalts and 2005 Pontiac G5s (actually related to "Pursuits," which are the Canadian version of the G5).

77.     The TSB provided the following recommendations/instructions to its dealers – but not to Plaintiff, the other Class members, or the public in general:

> There is potential for the driver to inadvertently turn off the ignition due to low key ignition cylinder torque/effort. The concern is more likely to occur if the driver is short and has a large key chain.
>
> In the cases this condition was documented, the driver's knee would contact the key chain while the vehicle was turning. The steering column was adjusted all the way down. This is more likely to happen to a person that is short as they will have the seat positioned closer to the steering column.
>
> In cases that fit this profile, question the customer thoroughly to determine if this may be the cause. The customer should be advised of this potential and to take steps, such as removing unessential items from their key chains, to prevent it.
>
> Please follow this diagnosis process thoroughly and complete each step. If the condition exhibited is resolved without completing every step, remaining steps do not need to be performed.

78.     At this time, however Old GM knew that the inadvertent turning off of the ignition in the Defective Vehicles was due to the ignition switch defect in those vehicles, and was not limited to short drivers using large heavy key chains.

---

[12]   "Detent" – refers to the device used to mechanically resist the rotation of the ignition.

79.   Old GM failed to disclose and, in fact, concealed and obscured the problems that uniformly affected all of the Defective Vehicles, electing to wait until customers brought their cars to a dealership after an engine-stalling incident, and offered even its own dealers only an incomplete, incorrect, and insufficient description of the defects and the manner in which to actually remedy them.

80.   Although it had actual knowledge of the ignition switch defects that it was concealing, Old GM continued to sell hundreds of thousands of Defective Vehicles, reaping profits from those sales from purchasers who were never informed that their vehicles had an ignition switch defect and, therefore, were unable to consider that information in deciding whether to purchase or lease the Defective Vehicles.

81.   In March 2005, Old GM opened another PRTS after recieving a complaint of a Cobalt's ignition turning off while driving.

82.   During the March 2005 PRTS, Old GM did not reconsider any of the solutions offerred during the Feburary 2005 PRTS.  Instead, Old GM decided that the sole corrective action would be to advise customers to remove excess material from their key rings.

83.   Old GM made this decision despite knowing that the inadvertent turning off of the ignition in the Defective Vehicle was due to design defects, and was not limited to drivers having excess materials on their key ring.

84.   In May 2005, after yet another complaint, Old GM engineers again assessed the problem and proposed that GM re-design the key head from a "slotted" to a "hole" configuration.

85.   Despite this initial safety/redesign commitment, Old GM ultimately failed to follow through and closed the May 2005 PRTS without any action, further concealing what it knew from the public and continuing to subject the public – including Plaintiff and the other Class members – to the Defective Vehicles' serious safety risks.

86.   In or around October 2005, Old GM issued a TSB advising service technicians and GM dealers that the inadvertent turning of the key cylinder was causing the loss of the car's electrical system.

87.     Specifically, Old GM's October 2005 TSB informed that "GM has analyzed this condition and believes it may occur when a driver overloads a key ring, or when the driver's leg moves amid factors… Depending on these factors, a driver can unintentionally turn the vehicle off."

88.     Despite making these statements, Old GM knew that the inadvertent turning off of the ignition in the Defective Vehicles was due to the ignition switch defect in those vehicles, and was not caused by heavy key chains or a driver's size and seating position. Old GM knew that removing the non-essential material from key rings would not eliminate the possibility of inadvertent bumping of the ignition key from the "run" to the "accessory/off" position while the car is running.

89.     Old GM's statements in the October 2005 TSB were demonstrably false and misleading, as Old GM knew that these incidents were ultimately caused by the safety-related defects of the ignition system.

90.     In December 2005, Old GM issued an additional TSB, which represented that it applied to 2005-006 Chevrolet Cobalts, 2006 Chevrolet HHRs, 2005-2006 Pontiac Pursuit, 2006 Pontiac Solstices, and 2003-2006 Saturn Ions.

91.     Rather than disclosing the true nature of the defects and correcting them, the December 2005 TSB directed dealers to give customers who brought in their vehicle complaining about the issue "an insert for the key ring so that it goes from a 'slot' design to a hole design" to prevent the key ring from moving up and down in the slot. "[T]he previous key ring" was "replaced with a smaller" one; this change was supposedly able to keep the keys from hanging as low as they had in the past.[13] According to GM's records, Old GM dealers provided key inserts to 474 customers who brought their vehicles into dealers for service.[14]

92.     As with Old GM's prior statements regarding the Defective Vehicles, the information Old GM provided was false and misleading.

---

[13] *Id.* at 1-2.
[14] *Id.* at 3.

93.     In 2005, rather than issue a recall or provide notice of the known safety related defect as required by, among other things, the TREAD Act, Old GM chose to buy back Cobalts from certain customers who were experiencing engine stalling incidents; however, Old GM never informed the public that it was buying back Cobalts under certain circumstances due to the ignition switch defect. Despite buying back some Cobalts, Old GM refused to buy back Cobalts from other customers for unknown reasons.

94.     In November 2005, Old GM received notice and opened a file relating to another incident involving a 2005 Cobalt in Baldwin, Louisiana. In that incident the airbags failed to deploy after the Cobalt went off the road and hit a tree.

95.     In February 2006, Old GM received notice and opened a file relating to another incident involving a 2005 Cobalt in Lanexa, Virginia. In that incident the airbags failed to deploy after the Cobalt went off the road and hit a light pole. A download of the SDM (car's "black box") indicated that the key was in the "accessory/off" position at the time of the crash.

96.     In March 2006, Old GM received notice and opened a file relating to another incident involving a 2005 Cobalt in Frederick, Maryland. In that incident the airbags failed to deploy after the Cobalt went off the road and hit a utility pole. A download of the SDM indicated that the key was in the "accessory/off" position at the time of the crash.

97.     In 2006, Old GM approved a design change for the Cobalt's ignition switch supplied by Delphi. The new design included "the use of a new detent plunger and spring that increased torque force in the ignition switch." But the new design was not produced until the 2007 model year.[15]

98.     On August 1, 2006, Old GM opened yet another PRTS after received an additional complaint about a Cobalt stalling; however, as Old GM's common course of action would suggest, Old GM closed the PRTS without taking any action.

99.     Later that year, in December 2006, a 2005 Cobalt drove off the road a hit a tree in Sellenville, Pennsylvania. The frontal airbags failed to deploy in the accident. Old

---

[15]   *Id.* at 2.

1    GM received notice and opened a file related to the incident.

2         100.   On February 6, 2007, in Shaker Township, Pennsylvania, the airbags failed to

3    deploy when a 2006 Cobalt drove off the road and hit a tree. GM received notice of the

4    accident opened a file. A download of the SDM indicated that the key was in the

5    "accessory/off" position at the time of the crash.

6         101.   Throughout the remainder of 2007 and 2008, Old GM received notice of

7    numerous other accidents involving Cobalts during which the airbag failed to deploy.

8         102.   In 2007, NHTSA investigators met with Old GM to discuss its airbags, and

9    informed Old GM of the July 2005 frontal and fatal crash involving Amber Marie Rose.

10        103.   As alleged above, the airbags in Ms. Rose's 2005 Cobalt did not deploy. Data

11   retrieved from her vehicle's diagnostic system indicated that the ignition was in the

12   "accessory" position at the time of the accident. Old GM investigated and tracked similar

13   incidents.

14        104.   By the end of 2007, by GM's own admission, Old GM knew of 10 frontal

15   collisions in which the airbag did not deploy.[16] Plaintiff believes that Old GM actually knew

16   of many other similar incidents involving the ignition switch defects.

17        105.   For the next six years, GM continued to get complaints and continued to

18   investigate frontal crashes in which the airbags did not deploy. Despite this, GM never

19   satisfied its ongoing duties to disclose material facts to consumers (including those in the

20   Class and subclasses) regarding the defects and safety risks presented, and never undertook

21   to actually fix the defects.

22   **B.   GM Investigates But Continues To Conceal**

23        106.   In 2010, GM began a formal investigation of the frontal airbag non-

24   deployment incidents in Chevrolet Cobalts and Pontiac G5s.

25        107.   In 2012, GM engineers noticed that all crashes in which the ignition was

26   switched out of "run" only happened in cars from the 2007 model year and earlier.

27        108.   In May 2012, GM engineers tested the torque on the ignition switches for

28   _____

[16]   Feb. 24, 2014 Attachment B-573.6(c)(6) at 2.

Cobalt, G5, HHR, and Ion vehicles that had experienced crashes. The results of the tests revealed that the torque required to turn the ignition switches in most of these vehicles from the "run" to the "accessory/off" position did not meet GM's minimal torque specification requirements.

109. During additional field performance evaluations, GM determined that, although increasing the detent in the ignition switch would reduce the chance that they key would inadvertently move from the "run" to the "accessory/off" position, it would not be a total solution to the problem.

110. Despite GM engineers offering numerous ways to fix the problem, GM rejected each of the ideas.

111. The GM engineers understood that increasing the detent in the ignition switch alone was not a solution to the problem. However, GM continued to conceal the true nature and extent of the defect.

112. On February 7, 2014, after numerous assessments and facing increasing scrutiny of its conduct and the defects in its vehicles, GM finally announced a recall for the Cobalt and G5 vehicles.[17]

113. Thereafter, on February 24, 2014, GM adds an additional 600,000 Chevrolet HHR, Pontiac Solstice, Saturn Ion and Saturn Sky vehicles to the recall.

**C.   GM Waited Until 2014 to Finally Order a Recall of the Defective Vehicles.**

114. As noted, on February 7, 2014, GM informed NHTSA that it was conducting Recall No. 13454 for certain 2005-2007 model year Chevrolet Cobalts and 2007 model year Pontiac G5 vehicles.

115. On February 10, GM announced the recall, which applied to approximately 619,122 vehicles.

116. Two weeks later, after additional analysis, GM expanded the recall on February 25, 2014 to include an additional 748,024 vehicles: the Chevrolet HHR and Pontiac Solstice for model years 2006 and 2007, the Saturn Ion for model years 2003-2007,

---

[17] *Id.* at 4-5.

and the Saturn Sky for model year 2007.

117.   GM provided dealers with notice of the recall on February 26, 2014 and March 4, 2014 and mailed letters to current owners on March 10 and March 11, 2014.

118.   Thereafter, on March 28, 2014, GM again expanded the recall to cover all model years of the Chevrolet Cobalt and HHR, the Pontiac G5 and Solstice, and the Saturn Ion and Sky in the United States.  This second expansion included an additional 824,000 cars bringing the total number of recalled vehicles to roughly 2,191,146.

119.   According to GM, "the dealers are to replace the ignition switch,"[18] presumably with one with sufficient torque to prevent the inadvertent shut down of the ignition, power steering, power brakes, and airbags.

120.   In a video message addressed to GM employees on March 17, 2014, C.E.O. Mary Barra admitted that the Company had made mistakes and needed to change its processes.

121.   According to Ms. Barra, "Something went terribly wrong in our processes in this instance, and terrible things happened." Barra continued to promise, "We will be better because of this tragic situation if we seize this opportunity."[19]

122.   GM now faces an investigation by NHTSA, hearings in both the U.S. House and Senate, and a probe by the Department of Justice.

123.   On March 30, 2014, the Subcommittee on Oversight and Investigations for The Committee on Energy and Commerce ("Subcommittee") issued a memorandum that provided relevant background information of the ignition switch recall - outlining key facts and events leading up to the ignition switch recall – and formally announcing that on April 1, 2014, the Subcommittee would be holding a hearing entitled "The GM Ignition Switch Recall: Why Did it Take So Long?"[20]

124.   In addition to the investigation of GM for its failures related to the ignition

---

[18]   *Id.* at 6.
[19]   *"Something Went "Very Wrong" at G.M., Chief Says."* N.Y. TIMES (Mar. 18, 2014).
[20]   Available  at:  http://apps.washingtonpost.com/g/documents/politics/house-committee-on-energy-and-commerce-memorandum-for-hearing-on-the-gm-ignition-switch-recall-why-did-it-take-so-long/908/

COMPLAINT (CLASS ACTION)

switch defects, the National Highway Traffic Safety Administration ("NHTSA") is under investigation for its failures related to the same ignition switch defects in the Defective Vehicles.

125.   For example, in 2007, in response to complaints that had been coming into NHTSA since 2005, the chief of NHTSA's defects assessment division requested NHTSA to open a formal probe into why air bags in the 2003-2006 model year Cobalts and Saturns were not deploying; however, NHTSA denied the request and decided not to pursue the investigation because it did not see a discernible trend.[21]

126.   On April 1, 2014, GM went before the Subcommittee. In written testimony provided by Ms. Barra prior to the hearing she admitted that she does not know "why it took years for a safety defect to be announced[,]" adding that GM will be "fully transparent" in regards to the ignition switch defect and GM "will not shirk from [its] responsibilities now and in the future. Today's GM will do the right thing."

127.   At the hearing Ms. Barra faced questioning and comments from members of the Subcommittee.

128.   U.S. Representative Timothy Murphy stated that "[t]he red flags were there for GM and NHTSA to take action, but for some reason it didn't happen. To borrow a phrase, what we have here is a failure to communicate, and the results were deadly."[22]

129.   U.S. Representative Diana DeGette questioned Ms. Barra about GM's decision to continue selling Defective Vehicles without initialing a recall or fix despite knowing of the defective ignition switches and despite knowing that the Defective Vehicles were unsafe. Specifically, Diana DeGette said that GM elected not to replace a part of that would have cost 57 cents a car because of cost and the lack of "an acceptable business case." Instead, according to Diana DeGette, "[GM] continued to sell cars knowing they

---

[21] http://online.wsj.com/news/articles/SB10001424052702304157204579475300460311892?mg=reno64wsj&url=http%3A%2F%2Fonline.wsj.com%2Farticle%2FSB10001424052702304157204579475300460311892.html
[22] http://money.cnn.com/2014/04/01/news/companies/barra-congress-testimony/index.html?hpt=hp_t2

were unsafe," and the Subcommittee is "going to get to the bottom of this."[23]

130.   Ms. Barra acknowledged that statements in GM's documents from 2005 show that GM elected not to implement a fix because it was too expensive, noting that the documents were "very disturbing." [24]

131.   Ms. Barra stated that the decision not to implement a fix over cost concerns stemmed from operating under a "cost culture" in the days before the 2009 bankruptcy.[25]

132.   During the hearing, Ms. Barra admitted that the defective ignition switches were installed in Defective Vehicles despite the fact that GM was aware that the ignition switches did not meet GM's own specifications.[26] Ms. Barra added that if parts do not meet "performance, reliability and safety" standards, they would be recalled.

133.   During the hearing, when asked about when GM knew of problems and why decisions were made, Ms. Barra repeatedly said she did not know the answer.

134.   While GM has now appointed a new Vehicle Safety Chief, on information and belief at least 1.4 million Defective Vehicles remain on the road to this day; and, on information and belief, other vehicles not yet acknowledged by GM also have the deadly ignition switch defects.

135.   In addition to being inexcusably late, GM's recall is insufficient, as it does not correct the safety-related defects in the Defective Vehicles.

136.   Since at least 2005, GM has known that simply replacing the ignition switches on the Defective Vehicles is not a solution to the potential for the key to inadvertently turn from the "run" to the "accessory/off" position in these vehicles.

137.   GM's recall fails to address the design defect that causes the key fob/chain to hang too low on the steering column.

138.   Thus, even when the ignition switches are replaced, this defective condition would still exist in the Defective Vehicles and there continues to be the potential for a driver

---

[23]   *Id.*
[24]   *Id.*
[25]   *Id.*
[26]   *Id.*

1  to inadvertently turn the key from the "run" to the "accessory/off" position.

2  139.   Additionally, the recall does not call for a replace of every key in the

3  Defective Vehicles with the redesigned key – key that requires a hole instead of a slot.

4  These redesigned keys have been provided to 2010 Cobalt users under the assumption that

5  they reduce the risk of inadvertently turning the ignition from "run" to "accessory/off."

6  140.   Old GM and GM engineers have understood for quite some time that

7  increasing the detent in the ignition switch alone was not a complete solution to the

8  problem. This is evidence by the PRTS reports discussed above.

9  141.   Further, the recall fails to address the defect that causes the airbag to be

10  inoperable upon the engine being shut off.

11  **D.   Old GM Promoted the Defective Vehicles as Safe and Reliable.**

12  142.   In marketing and advertising materials, Old GM consistently promoted the

13  Defective Vehicles as safe and reliable and free of known defects.

14  143.   For example, one Cobalt ad promised that "Side curtain airbags coupled with

15  OnStar makes every journey the safest possible to assure that you and your occupants will

16  stay safe at all times."

17  144.   An ad for the 2006 Solstice promises that the vehicle"[b]rings power and

18  defines performance."

19  145.   A 2003 television spot for the Saturn vehicle closed with the tagline

20  "Specifically engineered for whatever is next." Another 2003 spot closed with the tagline

21  "Saturn. People first."

22  146.   A 2001 print ad touting the launch of the Saturn focused on safety:

23  Need is where you begin. In cars, it's about things like reliability, durability
24  and, of course, safety. That's where we started when developing our new
   line of cars. And it wasn't until we were satisfied that we added things....

25  147.   Old GM made these representations to boost vehicle sales and maximize

26  profits while knowing that the ignition switches in the Defective Vehicles were defective.

27  148.   Throughout the relevant period, Old GM possessed vastly superior knowledge

28  and information to that of consumers – if not exclusive information – about the design and

function of the ignition switches in the Defective Vehicles and the existence of the defects in those vehicles.

149.   Old GM never informed consumers about the ignition switch defects. Such conduct and statement were false, misleading and deceptive.

**E.   The Ignition Switch Defects have Harmed Plaintiffs and the Class**

150.   The ignition switch defects have caused damage to Plaintiffs and the Class.

151.   A vehicle purchased, leased or retained with a serious safety defect is worth less than the equivalent vehicle leased, purchased or retained without the defect.

152.   A vehicle purchased, leased or retained under the reasonable assumption that it is safe is worth more than a vehicle known to be subject to the unreasonable risk of catastrophic accident because of the ignition switch defects.

153.   Purchasers and lessees paid more for the Defective Vehicles, through a higher purchase price or higher lease payments, than they would have had the ignition switch defects been disclosed. Plaintiffs and the Class overpaid for their Defective Vehicles. Because of the concealed ignition switch defects. Plaintiffs did not receive the benefit of the bargain.

154.   Plaintiff and the Class are stuck with unsafe vehicles that are now worth less than they would have been but for GM's failure to disclose the ignition switch defects. Now that the facts regarding the defects have been revealed to the public, reasonable cars buyers would be adverse to buying a Defective Vehicle and would tend to pay less for one of the Defective Vehicles than had it never had the defect.

155.   GM admits to at least twelve deaths resulting from accidents linked to the ignition switch defects in the Defective Vehicles. However, Plaintiffs believe that the actual number is much higher, and that there may have been hundreds of deaths and injuries attributable to the ignitions switch defects.

156.   If Old GM or GM had timely disclosed the ignition switch defects as required by, among other things, the TREAD Act all Class members' vehicles would now be worth more.

# V.   SUCCESSOR LIABILITY

157.   As discussed above, GM expressly assumed certain obligations under, *inter alia*, the TREAD Act, and is liable for its non-disclosure of the ignition switch defects from the date of its formation on July 10, 2009.

158.   GM also expressly assumed liability in the Master Sale and Purchase Agreement of June 26, 2009, and this assumption of liability includes, but is not limited to, the claims of the Class and Subclasses under various consumer protection statutes.

159.   GM has successor liability for Old GM's acts and omissions in the marketing and sale of the Defective Vehicles because it has continued the business enterprise of Old GM, for the following reasons:

- GM admits that it knew of the ignition system defects from the very date of its formation;

- GM has continued in the business of designing, manufacturing, and marketing vehicles, including at least some of the same vehicles as Old GM;

- GM retained the bulk of the employees of Old GM;

- GM acquired owned and leased real property of Old GM, including all machinery, equipment, tools, information technology, product inventory, and intellectual property;

- GM acquired the contracts, books, and records of Old GM; and

- GM acquired all goodwill and other intangible personal property of Old GM.

157.   All applicable statutes of limitation have been tolled by GM's knowing and active fraudulent concealment and denial of the facts alleged herein. Plaintiffs and Class members did not discover, and did not know of facts that would have caused a reasonable person to suspect, that Old GM and GM did not report information within their knowledge to federal authorities (NHTSA) or consumers, nor would a reasonable and diligent investigation have disclosed that Old GM and GM had information in their possession about the existence and dangerousness of the defect and opted to conceal that information until shortly before this class action was filed.

158.   Indeed, Old GM instructed its service shops to provide Defective Vehicle

owners with a new key ring if they complained about unintended shut down, rather than admit what Old GM knew – that the ignition switches were dangerously defective and warranted replacement with a properly designed and built ignition system.

159.   Old GM and GM were, and GM remains, under a continuing duty to disclose to NHTSA, Plaintiffs, and the Class the true character, quality, and nature of the Defective Vehicles; that this defect is based on dangerous, inadequate, and defective design and/or substandard materials; and that it will require repair, poses a severe safety concern, and diminishes the value of the Defective Vehicles.

160.   Because of the active concealment by Old GM and GM, any and all limitations periods otherwise applicable to Plaintiffs' claims have been tolled.

## VI.   CLASS ALLEGATIONS

161.   Under Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, Plaintiffs bring this action on behalf of themselves and a Class initially defined as follows:

> All persons in the United States who currently own or lease one or more of the following GM vehicles: 2003-2011Saturn Ion; 2005-2011 Chevrolet Cobalt; 2005-2011 Pontiac G5; 2006-2011 Chevrolet HHR; 2005-2011 Pontiac Pursuit; 2006-2011 Pontiac Solstice; and 2007-2011 Saturn Sky.

(the "Class")

162.   Additionally, Plaintiffs seek to represent the following statewide subclasses:

- All persons in the State of Arizona who currently own or lease one or more of the following GM vehicles: 2003-2011Saturn Ion; 2005-2011 Chevrolet Cobalt; 2005-2011 Pontiac G5; 2006-2011 Chevrolet HHR; 2005-2011 Pontiac Pursuit; 2006-2011 Pontiac Solstice; and 2007-2011 Saturn Sky (the "Arizona Subclass");

- All persons in the State of New York who currently own or lease one or more of the following GM vehicles: 2003-2011Saturn Ion; 2005-2011 Chevrolet Cobalt; 2005-2011 Pontiac G5; 2006-2011 Chevrolet HHR; 2005-2011 Pontiac Pursuit; 2006-2011 Pontiac Solstice; and 2007-2011 Saturn Sky (the "New York Subclass"); and,

- All persons in the State of Michigan who currently own or lease one or more of the following GM vehicles: 2003-2011Saturn Ion; 2005-2011 Chevrolet Cobalt; 2005-2011 Pontiac G5; 2006-2011 Chevrolet HHR; 2005-2011 Pontiac Pursuit; 2006-2011 Pontiac Solstice; and 2007-2011 Saturn Sky (the "Michigan Subclass).

(collectively referred to herein as the "Subclasses").

163.    The "Class Period" for the Class and any Subclass dates back to January 1, 2002, and continues through the present and the date of judgment. Alternatively, "Class Period" for the Class and any Subclass dates back to the length of the longest applicable statute of limitations for any claims asserted on behalf of that Class from the date this action was commenced and continues through the present and the date of judgment. Excluded from the Class are GM, its employees, co-conspirators, officers, directors, legal representatives, heirs, successors and wholly or partly owned subsidiaries or affiliated companies; class counsel and their employees; any individuals who experienced physical injuries as a result of the defects at issue in this litigation; and the judge and court staff to whom this case is assigned. Plaintiff reserves the right to amend the definition of the class if discovery or further investigation reveals that the class should be expanded or otherwise modified.

164.    All requirements for class certification in Fed. R. Civ. P. 23(a), 23(b)(1), 23(b)(2) and/or 23(b)(3) (or any other applicable state or federal rule of civil procedure) are satisfied with respect to the Class and each Subclass.

165.    Numerosity of the Class.  Members of the Class and each Subclass are so numerous that their individual joinder herein is impracticable.  The precise number of members of the Class and each Subclass and their addresses are presently unknown to Plaintiffs.  Plaintiffs are informed and believe that GM has manufactured and sold millions of Defective Vehicles Nationwide and Statewide.  Plaintiffs therefore allege that the total number of members of the Class and each Subclass is well in excess of 500 persons and/or entities who would fall within the proposed class definition.

166.    Ascertainable Class.  The community of interest among these class members in the litigation is well defined and the proposed classes are ascertainable from objective criteria.  If necessary to preserve the case as a class action, the court itself can redefine the Class and any Subclass.

167.   Common Questions of Fact and Law Exist and Predominate over Individual Issues.   There is a well-defined community of interest in the questions of law and fact involved affecting the parties to be represented.   These common questions of law and fact exist as to all members of the Class and Subclasses and predominate over the questions affecting only individual members of the classes.   These common legal and factual questions include without limitation:

      a.    Whether the Defective Vehicles suffer from ignition switch defects;

      b.    Whether Old GM and GM concealed the defects;

      c.    Whether Old GM and GM misrepresented that the Defective Vehicles were safe;

      d.    Whether Old GM and GM engaged in fraud, fraudulent concealment, and made fraudulent misrepresentations to the public;

      e.    Whether Old GM and GM engaged in unfair, deceptive, unlawful and/or fraudulent acts or practices in trade or commerce by failing to disclose that the Defective Vehicles were designed, manufactured, and sold with defective ignition switches;

      f.    Whether the alleged conduct by GM violated laws as Plaintiff alleges;

      g.    Whether Old GM's and GM's unlawful, unfair and/or deceptive practices harmed Plaintiff and the members of the Class and Subclasses;

      h.    Whether Plaintiff and members of the Class and Subclasses are entitled to damages;

      i.    Whether Plaintiff and the members of the Class are entitled to equitable and/or injunctive relief; and

      j.    Whether, and to what extent, GM has successor liability for the acts and omissions of Old GM;

168.   GM has engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiffs individually and on behalf of the other members of the

Class and Subclasses. Similar or identical statutory and common law violations, business practices, and injuries are involved as to all members in the Class and Subclasses. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action.

169.    Plaintiffs are members of and present claims that are typical of the claims of members of the Class and the Subclass.  Plaintiffs owned or leased one of GM's Defective Vehicles.  The safety related defects in Plaintiffs' Vehicle are the same as those in other Class and Subclass members' Vehicle. Plaintiffs and all Class and Subclass members each sustained damages arising from GM's wrongful conduct, as alleged more fully herein.  The same material facts that GM withheld from the Plaintiffs were withheld from the other members of the Class and Subclasses.  The test for materiality is an objective test subject to class wide proof.

170.    All members of the Class and Subclasses have been the subject of GM's unfair and unlawful business practices as described herein.  The relief sought is common, unitary, and class-wide in nature.

171.    Adequacy of Representation.  Plaintiffs will fairly and adequately represent and protect the interest of the members of the Class and each Subclass.  Plaintiffs share a common interest with all Plaintiff class members, with respect to the conduct of GM herein, and redress of same.  Plaintiffs have suffered an injury-in-fact as a result of the conduct of GM, as alleged herein.  Plaintiffs have retained counsel who are competent and experienced in the prosecution of complex consumer fraud, mass tort and class actions.  Plaintiffs and their counsel intend to prosecute this action vigorously and faithfully for the benefit of the Class and Subclass members.  Plaintiffs have no interests contrary to the class members, and will fairly and adequately protect the interests of the classes.

172.    Community of Interest. The proposed classes have a well-defined community of interest in the questions of fact and law to be litigated.  The common questions of law and fact are predominant with respect to the liability issues, relief issues and anticipated

affirmative defenses. The Named Plaintiffs have claims typical of the Class and each Subclass.

173.   Superiority of Class Adjudication. The certification of a classes in this action is superior to the litigation of a multitude of cases by members of the putative classes.  Class adjudication will conserve judicial resources and will avoid the possibility of inconsistent rulings. Moreover, there are class members who are unlikely to join or bring an action due to, among other reasons, their reluctance to sue GM and/or their inability to afford a separate action. Equity dictates that all persons who stand to benefit from the relief sought herein should be subject to the lawsuit and hence subject to an order spreading the costs of the litigation among the class members in relationship to the benefits received.  Even if the members of the classes themselves could afford individual litigation, the court system could not.   Individualized litigation presents a potential for inconsistent or contradictory judgments.  Individualized litigation increases the delay and expense to all parties and the court system presented by the complex legal and factual issues of the case.  By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

174.   In the alternative, the above-defined Class and Subclasses may be certified pursuant to Fed. R. Civ. P. 23(b)(1) and (b)(2) because:

a.   The prosecution of separate actions by the individual members of the Class and each Subclass would create a risk of inconsistent or varying adjudication with respect to individual class members' claims which would establish incompatible standards of conduct for GM;

b.   The prosecution of separate actions by individual members of the classes would create a risk of adjudications which would as a practical matter be dispositive of the interests of other members of the classes who are not parties to the adjudications, or which would substantially impair or impede the ability of other class members to protect their interests; and,

c.   Defendant has acted or refused to act on grounds generally applicable to the classes, thereby making appropriate final and injunctive relief with respect to the Class and each State Subclass.

## VII.   INTENT

175.   GM knowingly and intentionally committed the acts, concealments and material omissions alleged herein.  All actions and omissions by GM were willful and not the result of mistake or inadvertence.  At all times relevant, Defendant was aware of the defective nature of their Vehicles. Despite this, GM knowingly and intentionally undertook and directed that their respective business undertake the illicit practices and conceal the material facts which are the subject of this suit.

## FIRST CAUSE OF ACTION

**Violation of the Magnuson-Moss Warranty Act ("MMWA")**
**15 U.S.C. §§2301 *et seq.***
**(Brought on behalf of Nationwide Class)**

176.   Plaintiffs and the Class incorporate by reference all preceding paragraphs as though fully stated herein.

177.   Plaintiffs bring this Count on behalf of the Nationwide Class.

178.   This Court has jurisdiction to hear and decide this claim by virtue of 28 U.S.C. §1332(a)-(d).

179.   Plaintiffs are consumers within the meaning of the MMWA, 15 U.S.C. §2301(3).

180.   Old GM and GM are suppliers and warrantors as those terms are defined within the MMWA, 15 U.S.C. §2301(4)-(5).

181.   The Defective Vehicles are consumer products within the meaning of the MMWA, 15 U.S.C. §2301(1).

182.   15 U.S.C. §2301(d)(1) provides any consumer with a cause of action when the consumer is damaged by the failure of a warrantor to comply with a written or implied warranty.

183.   GM and Old GM's express warranties are written warranties within the meaning of the MMWA, 15 U.S.C. §2301(6). The Defective Vehicles' implied warranties are covered under 15 U.S.C. §2301(7).

184.   Old GM and GM breached these warranties by and through the above described conduct. The Defective Vehicles all share a common design defect in that they contain a defective ignition system that can cause the Defective Vehicles to suddenly fail during normal operation, leaving occupants of the Defective Vehicles, as well as the general public, vulnerable to crashes, serious injury, and death. GM has admitted that the Defective Vehicles are defective in issuing its recall.

185.   Plaintiffs and each of the other Class members is in privity with GM, as Plaintiffs and each Class member had sufficient dealings with GM, Old GM and/or its agents (dealerships). Nonetheless, privity is not required, as Plaintiffs and all Class members are the intended third-party beneficiary of contracts between GM and/or Old GM and its dealers, specifically, GM's and Old GM's implied warranties. Also, privity is not required because the Defective Vehicles are dangerous instrumentalities due to the aforementioned defects and nonconformities.

186.   Affording GM a reasonable opportunity to cure its breach of warranties would be unnecessary and futile here. At the time of sale or lease of each Defective Vehicle, GM or Old GM knew, should have known, or was reckless in not knowing of its misrepresentations concerning the Defective Vehicles' nonconformity and inability to perform as warranted. However, Old GM or GM failed to disclose the known defects to consumer and/or the general public.

187.   Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirement that Plaintiffs resort to an informal dispute resolution procedure and/or afford GM a reasonable opportunity to cure its breach of warranties is excused and thereby deemed satisfied.

188.   Plaintiffs and Class members would suffer economic hardship if they returned their Defective Vehicles while not receiving the return of all payment made by them to GM

and/or Old GM. GM is refusing to revoke acceptance and return all payment made immediately. As such, Plaintiffs and Class members retention of their Defective Vehicles does not equate to a re-acceptance of their Defective Vehicles.

189.   The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum of $25. The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit. Plaintiffs, individually and on behalf of the other Class members, seek all damages permitted by law, including diminution in value of their vehicles, in an amount to be proven at trial.

## SECOND CAUSE OF ACTION

### Fraudulent Concealment
### (Brought on behalf of the Nationwide Class)

190.   Plaintiffs and the Class incorporate by reference all preceding paragraphs as though fully stated herein.

191.   This claim is brought on behalf of the Nationwide Class.

192.   GM concealed and suppressed material facts concerning the ignition switch defects, and GM also has successor liability for the acts of concealment and oppression of Old GM as set forth above (as such, the Companies are referred to collectively in this Count as "GM.").

193.   GM intentional concealed material facts from Plaintiffs, the other Class members, the public, and NHTSA. GM knew that the Defective Vehicles were designed and manufactured with ignition switch defects, but GM intentionally concealed those material facts. Although the Defective vehicles contain material safety defects that GM knew of, or should have known of, at the time of distribution, GM recklessly manufactured and distributed those vehicles to consumers in the United States. Those consumers had no knowledge of the defects.

194.   Notwithstanding GM's knowledge of the design defects and inherent safety risks in their Defective Vehicles, and their knowledge of designs that could eliminate the

defects or lessen the safety hazards, at all times since at least 2001 and continuing through the Class Period, GM failed and refused to alter their Defective Vehicles ignition switch design, and instead engaged in a continuous pattern of deception, suppression and concealment of material facts, designed to mislead Plaintiffs and Class members into believing that the Defective Vehicles they owned were safe.

195.    Rather than provide consumers with complete and accurate information based on their exclusive and superior knowledge regarding the ignition switch defects – particularly the accident reports involving the non-deployment of airbags in frontal collisions - GM, engaged in a continuing and consistent pattern and practice of deception and concealment, up to and through the Class Period, to mislead consumers into believing GM's products were defect-free and safe to use.  As a result, consumers had no knowledge of the true nature and extent of the safety risks involved in continuing to use GM's Defective Vehicles.

196.    GM had a duty to disclose material facts to Plaintiffs and Class regarding the ongoing dangers of the Defective Vehicles at all times before and during the Class Period. GM's duty to disclose the ignition switch defects stemmed from the fact that the defects were known and/or accessible only to GM who had superior knowledge and access to the facts, and GM knew they were not known to or reasonably discoverable by Plaintiffs and the Class. These omitted and concealed facts were material because they directly impact the safety of the Defective Vehicles. Whether an ignition switch was designed and manufactured with appropriate safeguards is a material safety concern.

197.    Such disclosures should have been provided to Plaintiffs and each Class member in the state in which they reside.  Each day in which GM did not do this constitutes an actionable offence in the state in which the Plaintiffs and Class member resides.  GM's failure to disclose all material facts to Plaintiffs and the Class prevented Plaintiffs and the Class from being able to discover the truth about the dangerous products, despite reasonable diligence, and to take further steps to protect themselves, their property and to assert their rights.

198.   Up to the date of GM's recall, GM had continued its concealment and suppression by failing to inform the public about the true nature and scope of the defects and safety risks inherent in the use of their Defective Vehicles.

199.   GM actively concealed and/or suppressed these material facts, in whole or in part, to protect their profits and avoid a costly recall, and they did so at the expense of Plaintiffs and the Class.

200.   On information and belief, GM has still not made full and adequate disclosure and continues to defraud Plaintiffs and the Class and conceal material information regarding the defects that exist in the Defective Vehicles and other GM vehicles.

201.   Plaintiffs and the Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts. Plaintiffs' and the Class's actions were justified. GM was in exclusive control of the material facts and such facts were not known to the public, Plaintiffs, or the Class.

202.   Because of the concealment and/or suppression of the facts, Plaintiffs and the Class sustained damage because they purchased and retained vehicles that are now diminished in value from what they would have been had Old GM or GM timely disclosed the ignition switch defects.

203.   GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class's rights and well-being to enrich the Companies. GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

### **THIRD CAUSE OF ACTION**

**Violation of the Arizona Consumer Fraud Act, A.R.S. §§44-1522 *et seq.*
(Brought on behalf of the Arizona State Subclass)**

204.   Plaintiffs and the Class incorporate by reference all preceding paragraphs of this Complaint as though fully stated herein.

205.   Plaintiff Phillip brings this action on behalf of himself and on behalf of the Arizona State Subclass against GM for violations of the Arizona Consumer Fraud Act - A.R.S. §44-1522 ("ACFA").

206.   GM also has successor liability for Old GM's unfair, unconscionable, and deceptive acts or practices as outline above and in this count. As such, both Old GM and GM are referred to collectively in this Count as "GM."

207.   This claim is based on GM's deceptive and misleading conduct and common omissions of material fact.

208.   Plaintiff Phillip and each member of the Arizona Subclass is a "person" as defined in section 44-1521 of the ACFA.

209.   GM engaged in unfair or deceptive acts or practices that violated ACFA.

210.   Plaintiff Phillip and other Subclass members were deceived by GM's failure to disclose that the Defective Vehicles share a common design defect in that they are equipped with defective ignition switches that can suddenly fail during normal operation, leaving occupants of the Defective Vehicles vulnerable to crashes, serious injury, and death. GM has admitted that the Defective Vehicles are defective by issuing its recall.

211.   The Defective Vehicles, each of them, owned or leased by Plaintiff and Subclass members contains an inherent defect, which is substantially likely to result in malfunction when used as reasonably anticipated and intended.

212.   By manufacturing, marketing and distributing for sale the Defective Vehicles, GM engaged in trade or commerce, the sale of goods, and/or practices affecting commerce within the meaning of the ACFA.

213.   By failing to disclose and concealing the defective nature of the Defective Vehicles from Plaintiff Phillip and Arizona Subclass members, GM has engaged in deceptive, unfair, fraudulent, and misleading acts and practices in connection with consumer transactions, as GM has represented that its Defective Vehicles had characteristics and benefits that they do not have, and represented that its Defective Vehicles were of a particular standard, quality or grade when they were of another.

214. The deceptive and misleading acts have a broad, public impact on consumers at large and does harm to the public interest.

215. GM knew that its Defective Vehicles were defectively designed and were not suitable for their intended use. GM also knew that the design defects in its Defective Vehicles created and constituted a serious safety hazard.  Further, GM knew that the design defects and safety hazards in its Defective Vehicles could be substantially decreased, if not totally eliminated, by the adoption of alternate designs readily available in the market.

216. Notwithstanding GM's knowledge of the design defects and inherent safety risks in Defective Vehicles, and its knowledge of alternate designs to eliminate the defects and safety hazards, GM failed and refused to alter the design of the ignition switch systems in the Defective Vehicles, and instead engaged in a continuous pattern of deception and concealment, designed to mislead Plaintiff Phillip and members of the Arizona Subclass into believing that its Defective Vehicles were safe, when in fact they were, and continue to be, dangerously defective.

217. GM, at all times up to the filing of this Complaint, has engaged in concealment and misrepresentation which misleads Plaintiffs and all  members of the Arizona Subclass into believing that GM's Defective Vehicles were either free of defects are safe to operate.  As a result of GM's concealment and misrepresentation, Plaintiffs did not know, and could not through the exercise of reasonable diligence be expected to know, of the defects and safety risks involved in their use of GM's Defective Vehicles.

218. Despite reasonable diligence, neither Plaintiff Phillip, nor any reasonable consumer acting in the ordinary course of use, including Class members, could learn the facts GM knowingly concealed from the general public.  The defective ignition switch systems are not readily apparent or visible to Class members using the Defective Vehicles as intended in the ordinary course.  The only time a risk becomes apparent is when a vehicle experiences an issue related to the defective ignitions.  By that time, it is too late for Plaintiff Phillip and Arizona Subclass members, like other reasonable consumers, to take

practical steps to protect themselves and their property from the danger associated with the defect.

219.   GM's unfair and deceptive acts and/or practices occurred repeatedly in GM's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

220.   GM knew that its Defective Vehicles were defectively designed and/or manufactured and were not fit for their intended purpose.  Despite this, GM marketed and sold these Defective Vehicles to the Class for financial gain.

221.   GM was under an ongoing and continuous duty to Plaintiff Phillip and the Arizona Subclass Members to disclose the defective nature of their Vehicles because:

a.   GM was in a superior position to know the true state of facts about the safety defects in its Defective Vehicles;

b.   Plaintiff Phillip and Arizona Subclass members could not reasonably have been expected to learn or discover that the Defective Vehicles had dangerous safety defects until they manifested failure; and,

c.   GM knew that Plaintiff Phillip and Arizona Subclass members could not reasonably have been expected to learn or discover the safety defects in the Defective Vehicles.

222.   As described herein, GM has engaged in consumer-oriented conduct that was materially misleading and generally directed at the consuming public.

223.   Proof of individual reliance or individual injury on the part of absent Class members is not required to establish a basis for relief under ACFA.

224.   In failing to disclose the defects in its Defective Vehicles, GM knowingly and intentionally concealed material facts and breached their duty not to do so.

225.   The facts concealed or not disclosed by GM to Plaintiff Phillip and members of the Arizona Subclass are material in that reasonable consumers would have considered them to be important in deciding whether to purchase (or retain) GM's Defective Vehicles or pay a lesser price.  Had Plaintiff Phillip and the Subclass members known of true extent

of the defective nature of the Defective Vehicles, they would not have purchased (or retained) the vehicles, or would have paid less for them.

226.   GM intended for Plaintiff Phillip and Arizona Subclass members to rely on it to provide safe, adequate designed, and adequately manufactured automobiles and to honestly and accurately reveal the problems described throughout this Complaint.

227.   Further, Plaintiff Phillip and members of the Arizona Subclass reasonably expected that GM's Defective Vehicles would function safety and not be susceptible to the hazards described within. That is the reasonable and objective consumer expectation for Defective Vehicles.

228.   Plaintiff Phillip and other Arizona Subclass members have suffered injury in fact and actual damages resulting from GM's material omissions and misrepresentations because they paid an inflated purchase price for the Defective Vehicles.

229.   Plaintiff Phillip's and Arizona Subclass members' injuries were proximately caused by GM's deceptive acts or practices. The resulting damage and injury is common to Plaintiff Phillip and all Arizona Subclass members and can only be adequately remedied through the common, class-wide relief sought herein.

230.   Plaintiff Phillip and the Arizona Subclass members are entitled to legal and equitable relief against GM, including injunctions, consequential damages, rescission, restitution, attorneys' fees, costs of suit, prejudgment interest and other relief as appropriate.

## FOURTH CAUSE OF ACTION

**Violation of New York's Consumer Protection from Deceptive Acts and Practices Statute, N.Y. Gen. Bus. Law §§349 *et seq.***
**(Brought on behalf of the New York State Subclass)**

231.   Plaintiff and the Class incorporate by reference all preceding paragraphs of this Complaint as though fully stated herein.

232.   Plaintiff Torres brings this action on behalf of herself and on behalf of the Class against GM for violations of New York's Consumer Protection from Deceptive Acts and Practices Statute - N.Y. Gen. Bus. Law §349 *et seq.* ("GBL §349").

233.   GM also has successor liability for Old GM's unfair, unconscionable, and deceptive acts or practices as outline above and in this count. As such, both Old GM and GM are referred to collectively in this Count as "GM."

234.   This claim is based on GM's deceptive and misleading conduct and common omissions of material fact.

235.   Plaintiff Torres and each member of the New York Subclass is a "consumer" as defined in GBL §349.

236.   GM engaged in unfair or deceptive acts or practices that violated GBL §349.

237.   Plaintiff Torres and other New York Subclass members were deceived by GM's failure to disclose that the Defective Vehicles share a common design defect in that they are equipped with defective ignition switches that can suddenly fail during normal operation, leaving occupants of the Defective Vehicles vulnerable to crashes, serious injury, and death. GM has admitted that the Defective Vehicles are defective by issuing its recall.

238.   The Defective Vehicles, each of them, owned or leased by Plaintiff Torres and the members of the New York Subclass contain an inherent defect, which is substantially likely to result in malfunction when used as reasonably anticipated and intended.

239.   By manufacturing, marketing and distributing for sale the Defective Vehicles, GM engaged in trade or commerce, the sale of goods, and/or practices affecting commerce within the meaning of the GBL §349.

240.   By failing to disclose and concealing the defective nature of the Defective Vehicles from Plaintiff Torres and New York Subclass members, GM has engaged in deceptive, unfair, fraudulent, and misleading acts and practices in connection with consumer transactions, as GM has represented that its Defective Vehicles had characteristics and benefits that they do not have, and represented that its Defective Vehicles were of a particular standard, quality or grade when they were of another.

241.   The deceptive and misleading acts have a broad, public impact on consumers at large and does harm to the public interest.

242.   GM knew that its Defective Vehicles were defectively designed and were not suitable for their intended use. GM also knew that the design defects in its Defective Vehicles created and constituted a serious safety hazard.  Further, GM knew that the design defects and safety hazards in its Defective Vehicles could be substantially decreased, if not totally eliminated, by the adoption of alternate designs readily available in the market.

243.   Notwithstanding GM's knowledge of the design defects and inherent safety risks in Defective Vehicles, and its knowledge of alternate designs to eliminate the defects and safety hazards, GM failed and refused to alter the design of the ignition switch systems in the Defective Vehicles, and instead engaged in a continuous pattern of deception and concealment, designed to mislead Plaintiff Torres and members of the New York Subclass into believing that its Defective Vehicles were safe, when in fact they were, and continue to be, dangerously defective.

244.   GM, at all times up to the filing of this Complaint, has engaged in concealment and misrepresentation which misleads Plaintiff Torres and all  members of the New York Subclass into believing that GM's Defective Vehicles were either free of defects are safe to operate.  As a result of GM's concealment and misrepresentation, Plaintiff Torres and all members of the New York Subclass did not know, and could not through the exercise of reasonable diligence be expected to know, of the defects and safety risks involved in their use of GM's Defective Vehicles.

245.   Despite reasonable diligence, neither Plaintiff Torres, nor any reasonable consumer acting in the ordinary course of use, including New York Subclass members, could learn the facts GM knowingly concealed from the general public.  The defective ignition switch systems are not readily apparent or visible to Class members using the Defective Vehicles as intended in the ordinary course.  The only time a risk becomes apparent is when a vehicle experiences an issue related to the defective ignitions.  By that time, it is too late for Plaintiff Torres and members of the New York Subclass, like other reasonable consumers, to take practical steps to protect themselves and their property from the danger associated with the defect.

246.   GM's unfair and deceptive acts and/or practices occurred repeatedly in GM's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

247.   GM knew that its Defective Vehicles were defectively designed and/or manufactured and were not fit for their intended purpose.  Despite this, GM marketed and sold these Defective Vehicles to the Class for financial gain.

248.   GM was under an ongoing and continuous duty to Plaintiff Torres and members of the New York Subclass to disclose the defective nature of their Vehicles because:

> a.   GM was in a superior position to know the true state of facts about the safety defects in its Defective Vehicles;
>
> b.   Plaintiff Torres and New York Subclass members could not reasonably have been expected to learn or discover that the Defective Vehicles had dangerous safety defects until they manifested failure; and,
>
> c.   GM knew that Plaintiff Torres and New York Subclass members could not reasonably have been expected to learn or discover the safety defects in the Defective Vehicles.

249.   As described herein, GM has engaged in consumer-oriented conduct that was materially misleading and generally directed at the consuming public.

250.   Proof of individual reliance or individual injury on the part of absent New York Subclass members is not required to establish a basis for relief under GBL §349.

251.   In failing to disclose the defects in its Defective Vehicles, GM knowingly and intentionally concealed material facts and breached their duty not to do so.

252.   The facts concealed or not disclosed by GM to Plaintiff Torres and members of the New York Subclass are material in that reasonable consumers would have considered them to be important in deciding whether to purchase (or retain) GM's Defective Vehicles or pay a lesser price.  Had Plaintiff Torres and the New York Subclass members known of

true extent of the defective nature of the Defective Vehicles, they would not have purchased (or retained) the vehicles, or would have paid less for them.

253.   GM intended for Plaintiff Torres and New York Subclass members to rely on it to provide safe, adequate designed, and adequately manufactured automobiles and to honestly and accurately reveal the problems described throughout this Complaint.

254.   Further, Plaintiff Torres and members of the New York Subclass reasonably expected that GM's Defective Vehicles would function safety and not be susceptible to the hazards described within. That is the reasonable and objective consumer expectation for Defective Vehicles.

255.   Plaintiff Torres and the New York Subclass members have suffered injury in fact and actual damages resulting from GM's material omissions and misrepresentations because they paid an inflated purchase price for the Defective Vehicles.

256.   Plaintiff Torres' and New York Subclass members' injuries were proximately caused by GM's deceptive acts or practices. The resulting damage and injury is common to Plaintiff Torres and all New York Subclass members and can only be adequately remedied through the common, class-wide relief sought herein.

257.   Plaintiff Torres and the New York Subclass members are entitled to legal and equitable relief against GM, including injunctions, consequential damages, rescission, restitution, attorneys' fees, costs of suit, prejudgment interest and other relief as appropriate.

## FIFTH CAUSE OF ACTION

**Violation of Michigan Consumer Protection Act, Mich. Comp. Laws §§445.903 *et seq.***
**(Brought on behalf of the Michigan State Subclass)**

258.   Plaintiffs and the Class incorporate by reference all preceding paragraphs of this Complaint as though fully stated herein.

259.   Plaintiff Kirkpatrick brings this action on behalf of herself and on behalf of the Michigan State Subclass against GM for violations of Michigan Consumer Protection Act – Mich. Comp. Laws §445.903 ("MCPA").

260.    This claim is based on GM's and Old GM's unfair, unconscionable, deceptive and misleading conduct and common omissions of material fact.

261.    GM also has successor liability for Old GM's unfair, unconscionable, and deceptive acts or practices as outline above and in this count. As such, both Old GM and GM are referred to collectively in this Count as "GM."

262.    Plaintiff Kirkpatrick and each member of the Michigan State Subclass are "persons" as defined by the MCPA.

263.    Additionally, GM is a "persons" as defined by the MCPA.

264.    Plaintiff Kirkpatrick and other Michigan Subclass members were deceived by GM's failure to disclose that the Defective Vehicles share a common design defect in that they are equipped with defective ignition switches that can suddenly fail during normal operation, leaving occupants of the Defective Vehicles vulnerable to crashes, serious injury, and death. GM has admitted that the Defective Vehicles are defective by issuing its recall.

265.    The Defective Vehicles, each of them, owned or leased by Plaintiff Kirkpatrick and Michigan Subclass members contains an inherent defect, which is substantially likely to result in malfunction when used as reasonably anticipated and intended.

266.    By manufacturing, marketing and distributing for sale the Defective Vehicles, GM engaged in trade or commerce, the sale of goods, and/or practices affecting commerce within the meaning of the MCPA.

267.    By failing to disclose and concealing the defective nature of the Defective Vehicles from Plaintiff Kirkpatrick and the Michigan Subclass members, GM has engaged in deceptive, unfair, fraudulent, and misleading acts and practices in connection with consumer transactions, as GM has represented that its Defective Vehicles had characteristics and benefits that they do not have, and represented that its Defective Vehicles were of a particular standard, quality or grade when they were of another.

268.    Additionally, GM engaged in deceptive, unfair, fraudulent, and misleading acts and practices in connection with consumer transactions, as GM advertised or

represented the Defective Vehicles with intent not to supply the Defective Vehicles as advertised.

269.    Specifically, GM has violated Mich. Comp. Laws §445.903(1)(c), (e), (g), (s), and (cc)  through the acts alleged herein and above, thereby entitling Plaintiff and members of the class to relief under the MCPA, *inter alia*:

      a.    Representing that the Defective Vehicles have characteristics which they do not have, in violation of §445.903(1)(c);

      b.    Representing that the Defective Vehicles were or a particular standard, quality, or grade when they are of another in violation of §445.903(1)(e); and

      c.    Advertising the Defective Vehicles with intent not to sell them as advertised in violation of §445.903(1)(g);

      d.    Failing to reveal material facts, the omission of which tends to mislead or deceive, and actually did mislead and deceive Plaintiff Kirkpatrick and all Michigan Subclass members, and which fact could not reasonably by known by Plaintiff Kirkpatrick and all Michigan Subclass members in violation of §445.903(1)(s);

      e.    Making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is in violation of §445.903(1)(bb);and

      f.    Failing to reveal facts that are material to the transaction in light of the representations GM made in a positive manner in advertisements in violation of §445.903(1)(cc).

270.    GM's deceptive and misleading acts have a broad, public impact on consumers at large and does harm to the public interest.

271.    GM knew that its Defective Vehicles were defectively designed and were not suitable for their intended use. GM also knew that the design defects in its Defective

Vehicles created and constituted a serious safety hazard.  Further, GM knew that the design defects and safety hazards in its Defective Vehicles could be substantially decreased, if not totally eliminated, by the adoption of alternate designs readily available in the market.

272.  Notwithstanding GM's knowledge of the design defects and inherent safety risks in Defective Vehicles, and its knowledge of alternate designs to eliminate the defects and safety hazards, GM failed and refused to alter the design of the ignition switch systems in the Defective Vehicles, and instead engaged in a continuous pattern of deception and concealment, designed to mislead Plaintiff Kirkpatrick and all members of the Michigan Subclass into believing that its Defective Vehicles were safe, when in fact they were, and continue to be, dangerously defective.

273.  GM, at all times up to the filing of this Complaint, has engaged in concealment and misrepresentation which misleads Plaintiff Kirkpatrick and all  members of the Michigan Subclass into believing that GM's Defective Vehicles were either free of defects are safe to operate.  As a result of GM's concealment and misrepresentation, Plaintiff Kirkpatrick did not know, and could not through the exercise of reasonable diligence be expected to know, of the defects and safety risks involved in their use of GM's Defective Vehicles.

274.  Despite reasonable diligence, neither Plaintiff Kirkpatrick, nor any reasonable consumer acting in the ordinary course of use, including the Michigan Subclass members, could learn the facts GM knowingly concealed from the general public.  The defective ignition switch systems are not readily apparent or visible to Michigan Subclass members using the Defective Vehicles as intended in the ordinary course.  The only time a risk becomes apparent is when a vehicle experiences an issue related to the defective ignitions. By that time, it is too late for Plaintiff Kirkpatrick and members of the Michigan Subclass, like other reasonable consumers, to take practical steps to protect themselves and their property from the danger associated with the defect.

275.   GM's unfair and deceptive acts and/or practices occurred repeatedly in GM's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

276.   GM knew that its Defective Vehicles were defectively designed and/or manufactured and were not fit for their intended purpose.  Despite this, GM marketed and sold these Defective Vehicles to the Class for financial gain.

277.   GM was under an ongoing and continuous duty to Plaintiff Kirkpatrick and the Michigan Subclass members to disclose the defective nature of their Vehicles because:

    a.    GM was in a superior position to know the true state of facts about the safety defects in its Defective Vehicles;

    b.    Plaintiff Kirkpatrick and all members of the Michigan Subclass could not reasonably have been expected to learn or discover that the Defective Vehicles had dangerous safety defects until they manifested failure; and,

    c.    GM knew that Plaintiffs and Class members could not reasonably have been expected to learn or discover the safety defects in the Defective Vehicles.

278.   As described herein, GM has engaged in consumer-oriented conduct that was materially misleading and generally directed at the consuming public.

279.   Proof of individual reliance or individual injury on the part of absent Michigan Subclass members is not required to establish a basis for relief under MCPA.

280.   In any event, to the extent individual reliance is required, reliance is presumed in cases involving omissions of material fact.

281.   In failing to disclose the defects in its Defective Vehicles, GM knowingly and intentionally concealed material facts and breached their duty not to do so.

282.   The facts concealed or not disclosed by GM to Plaintiff Kirkpatrick and members of the Michigan Subclass are material in that reasonable consumers would have considered them to be important in deciding whether to purchase (or retain) GM's Defective

1   Vehicles or pay a lesser price.   Had Plaintiff Kirkpatrick and the Michigan Subclass
2   members known of true extent of the defective nature of the Defective Vehicles, they would
3   not have purchased (or retained) the vehicles, or would have paid less for them.

4   283.   GM intended for Plaintiff Kirkpatrick and Michigan Subclass members to rely
5   on it to provide safe, adequate designed, and adequately manufactured automobiles and to
6   honestly and accurately reveal the problems described throughout this Complaint.

7   284.   Further, Plaintiff Kirkpatrick and members of the Michigan Subclass
8   reasonably expected that GM's Defective Vehicles would function safely and not be
9   susceptible to the hazards described within. That is the reasonable and objective consumer
10  expectation for Defective Vehicles.

11  285.   Plaintiff Kirkpatrick and other Michigan Subclass members have suffered
12  injury in fact and actual damages resulting from GM's material omissions and
13  misrepresentations because they paid an inflated purchase price for the Defective Vehicles.
14  GM failed to inform NHTSA, and therefore failed to inform consumers, that its vehicles had
15  a defective ignition switch that could lead to injury and death. Had Plaintiff Kirkpatrick and
16  the Michigan Subclass members known this, they would either not have purchased their
17  Defective Vehicles at all or would have paid less for them, and would not have retained
18  their Defective Vehicles. Plaintiff Kirkpatrick and members of the Michigan Subclass have
19  therefore suffered a "loss" because of the violations of the MCPA complaint of herein.

20  286.   Plaintiff Kirkpatrick's and Michigan Subclass members' injuries were
21  proximately caused by GM's deceptive acts or practices. The resulting damage and injury is
22  common to Plaintiff Kirkpatrick and all Michigan Subclass members and can only be
23  adequately remedied through the common, class-wide relief sought herein.

24  287.   Plaintiff Kirkpatrick and the Michigan Subclass members are entitled to legal
25  and equitable relief against GM, including injunctions, consequential damages, rescission,
26  restitution, attorneys' fees, costs of suit, prejudgment interest and other relief as appropriate.

27
28

## SIXTH CAUSE OF ACTION

**Breach of Express Warranty**
**(Brought on behalf of the Arizona, New York and Michigan Subclasses)**

288.   Plaintiffs hereby incorporate by reference every other paragraph of this Complaint as through fully stated herein.

289.   Plaintiffs bring this action on behalf of themselves and on behalf of the Arizona, New York and Michigan Subclasses (collectively referred to as the "Subclasses") against GM.

290.   GM and Old GM are and were at all relevant times "merchants" with respect to motor vehicles.

291.   In the course of selling the Defective Vehicles, both GM and Old GM expressly warranted to repair and adjusted to correct defects in materials and workmanship of any part supplied by GM or Old GM. GM has not repaired or adjusted the Defective Vehicles' materials and workmanship defects described herein.

292.   GM and Old GM also expressly warranted through statements and advertisements that the Defective Vehicles were of high quality, and at a minimum, would actually work properly and safety.

293.   These warranties were made, among other ways, in advertisements and in uniform statements made by both GM and Old GM to the public and consumers of the Defective Vehicles. These affirmations and promises were part of the basis of the bargain between both GM and Old GM, on the on hand, and Plaintiffs and the other Subclass members, on the other hand.

294.   Both GM and Old GM breached these warranties by knowingly selling or leasing to Plaintiffs and members of the Subclasses the Defective Vehicles with dangerous defects, which carried with it a serious risk of damage, injury and/or death.

295.   GM and Old GM failed to deliver to Plaintiffs and members of the Subclasses the things purchased, and have delivered a thing other than the thing purchased, and have thus breached the express warranties of sale.

296.   GM and Old GM intentionally and deceptively withheld material facts regarding the product defects from Plaintiffs, members of the Subclasses.

297.   Furthermore, the limited warranty of repair and/or adjustments to defective parts fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs and members of the Subclasses whole.

298.   As such, recovery by Plaintiffs and members of the Subclasses is not limited to the limited warrant of repair or adjustment to parts defective in materials or workmanship, and Plaintiffs, individually and on behalf of both the Arizona, New York and Michigan Subclasses, seeks all remedies as allowed by law.

299.   GM and Old GM knew or should have known that the Defective Vehicles would ultimately be used by Plaintiffs, Subclass members, and members of public.

300.   To the extent any notice is required, notice of the alleged breach of express warranty due to defects have been provided to GM and Old GM as evidenced by internal documents and the numerous other complaints filed against them,  showing a widespread problem, yet GM and Old GM continued in their failure to fix the actual problems and continued in their intentional concealment of material facts.

301.   As such, Plaintiffs notified GM of the breach within a reasonable time, and/or were not required to do so because affording GM a reasonable opportunity to cure its breach would have been futile.  GM was on notice of the defects contained in their Defective Vehicles.

302.   By way of the foregoing, GM and Old GM breached their express warranties to Plaintiffs and each Subclass.

303.   The Arizona Subclass: GM's and Old GM's practices, as alleged, were and are in violation of Ariz. Rev. Stat. Ann. §47-2313.

304.   The New York Subclass: GM's and Old GM's practices, as alleged, were and are in violation of N.Y. U.C.C. Law §§2-313.

305.   The Michigan Subclass: GM and Old GM's practices, as alleged, were and are in violation of Mich. Comp. Laws Ann. §440.2313.

306.    As a direct and proximate result of GM's and Old GM's breach, Plaintiffs and members of the Subclasses have suffered, and will continue to suffer, economic damages, in an amount that will be established at trial according to proof.

307.    Plaintiffs and members of the Subclasses are entitled to legal and equitable relief against Defendants, including consequential damages, rescission, attorneys' fees, costs of suit, and other relief as appropriate.

## SEVENTH CAUSE OF ACTION

### Breach of Implied Warranty
### (Brought on behalf of the Arizona, New York and Michigan Subclasses)

308.    Plaintiffs hereby incorporate by reference every other paragraph of this Complaint as through fully stated herein.

309.    Plaintiffs bring this action on behalf of themselves and on behalf of the Arizona, New York and Michigan State Subclasses (collectively referred to as the "Subclasses") against GM, under the implied warranty statutes of the various states outlined below.

310.    GM and Old GM were at all relevant times the manufacturer, distributor, warrantor, seller and/or lessor of the Defective Vehicles.  GM and Old GM knew or had reason to know of the specific use for which their Defective Vehicles were purchased.

311.    At the time Old GM and GM marketed and otherwise placed their Defective Vehicles into the stream of commerce, they knew that the vehicles would be sold to consumers, including Plaintiffs and members of the Subclasses, for personal and recreational use. GM and Old GM also knew that consumers, including Plaintiffs and members of the Subclasses, would have no ability or opportunity to inspect their vehicles for defects, but instead would rely on skill and judgment to furnish safe and reliable vehicles that were suitable for their particular purpose and free of dangerous defects.

312.    To the extent required, upon information and belief, Plaintiffs and all members of the Subclasses, if not in privity with GM or Old GM, are third-party beneficiaries of the contracts entered into between the dealerships and Old GM and/or GM.

313. In addition, here, Plaintiffs and members of the Subclasses need not prove privity as both Old GM and GM have placed Defective Vehicles into the stream of commerce, which because of the ignition switch defect each Defective Vehicle suffers from is a thing of danger, exposing consumers and members of the public to risk of severe injury or death.

314. GM and Old GM were aware of the particular purpose that each Plaintiff and class member had for the Defective Vehicle obtained; however, Old GM and/or GM failed to supply the vehicles to Plaintiff and all members of the Subclasses as described, as the Defective Vehicles present a dangerous safety risk.

315. Plaintiffs and members of the Subclasses relied on both Old GM and GM's skill and judgment to furnish safe and reliable vehicles that were suitable for their particular purpose and free of dangerous defects.

316. As such, Old GM and GM provided Plaintiffs and members of the Subclasses with an implied warranty that their Defective Vehicles and any parts thereof were merchantable and fit for the ordinary purposes for which they were sold and not unreasonably dangerous. However, the Defective Vehicles provided to Plaintiffs and the members of the Subclasses are not fit and suitable for their ordinary purpose because, *inter alia*, they contained design defects which were likely to cause the Defective Vehicles to inadvertently shut down during ordinary driving conditions, leading to an unreasonable likelihood of accident and an unreasonable likelihood that such accidents would cause serious bodily harm or death to, among others, vehicle occupants.

317. Old GM and GM impliedly warranted that the Defective Vehicles were of merchantable quality and fit for such use, did not contain dangerous defects and were not susceptible to inadvertently shutting down during ordinary driving conditions. This implied warranty included, among other things: (1) a warranty that the Defective Vehicles were manufactured, supplied, distributed, and/or sold by Old GM and GM were safe and reliable for their intended purpose; and (2) a warranty that their Defective Vehicles would be fit for their intended use while the Defective Vehicles were being operated.

318.   Old GM's and GM's Defective Vehicles supplied to Plaintiffs and members of the Subclasses did not possess the basic degree of fitness for ordinary use due to the defects described which created unreasonable risk of danger.   The defects are so basic that they render the Defective Vehicles unfit for ordinary purposes. The Defective Vehicles would not pass without objection in the automotive trade. As such, they are not merchantable.

319.   Contrary to the applicable implied warranties, Old GM's and GM's Defective Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose.  Instead, Old GM's and GM's Defective Vehicles are and continue to be defective and dangerous.

320.   The Arizona Subclass: GM's and Old GM's practices, as alleged, were and are in violation of Ariz. Rev. Stat. Ann. §47-2314

321.   The New York Subclass:  GM's and Old GM's practices, as alleged, were and are in violation of N.Y. U.C.C. Law §§2-314.

322.   The Michigan Subclass:  GM's and Old GM's practices, as alleged, were and are in violation of Mich. Comp. Laws Ann. §440.2314.

323.   As a direct and proximate result of GM's and Old GM's breach, Plaintiffs and members of the Subclasses have suffered, and will continue to suffer, significant damages, loss and injury in an amount that will be established at trial according to proof.

324.   Plaintiffs and the members of the Subclasses are entitled to legal and equitable relief against GM, including consequential damages, rescission, attorneys' fees, costs of suit, and other relief as appropriate.

## **JURY TRIAL DEMANDED**

Plaintiffs seek a trial by jury for all appropriate issues on each and every cause of action in this Complaint.

WHEREFORE, Plaintiffs pray for judgment against Defendant as follows:

**FOR THE PLAINTIFFS AND ALL CLASS MEMBERS:**

1)   For actual, compensatory and statutory damages/penalties, according to proof;

2)  For restitution, disgorgement and/or other equitable relief as the Court deems proper;

3)  For an order that GM be permanently enjoined from performing or proposing to perform any of the aforementioned acts of unfair, unlawful, deceptive and/or fraudulent business practices;

4)  For an order that GM be permanently enjoined from selling, offering to sell, or otherwise placing into the stream of commerce, dangerously defective vehicles;

5)  For an order certifying the proposed Class and each Subclasses, designating Plaintiffs as named representative of the Class, and designating the undersigned as Class Counsel;

6)  For an order that GM provide defect-free vehicles to the Plaintiffs and all members of the each Subclass, and that GM pay all costs associated with the replacement program, including all costs for parts and labor, or alternatively, for an order that GM buy back the defective vehicles of Plaintiffs and all members of the each Subclass;

7)  For pre-judgment and post-judgment interest according to proof;

8)  For reasonable attorney's fees and costs of suit;

9)  For any and all such other and further relief as may be available in law or equity;

10) For any and all such other and further relief as the Court may deem proper.

Respectfully submitted,

ZIMMERMAN REED, PLLP

Dated: April 1, 2014      By:   */s/ Hart L. Robinovitch*
CHARLES S. ZIMMERMAN, ESQ
HART L. ROBINOVITCH, ESQ.
BRADLEY C. BUHROW, ESQ.
14646 N. Kierland Blvd., Suite 145
Scottsdale, AZ 85254

*Attorneys for Plaintiffs*